P. Andrew McStay, Jr., OSB 033997
andymcstay@dwt.com
DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
Telephone: (503) 241-2300
Facsimile: (503) 778-5299

Matthew S. Warren (*pro hac vice to be filed*)
Erika H. Warren (*pro hac vice to be filed*)
Shaida Shahinfar (*pro hac vice to be filed*)
WARREN KASH WARREN LLP
2261 Market Street, No. 606
San Francisco, California 94114
Telephone: (415) 895-2940
Facsimile: (415) 895-2964
2025-04-22@cases.warrenlex.com

*Attorneys for Plaintiff RLH Assets, LLC*

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| RLH ASSETS, LLC, doing business as FOODWIT, an Oregon limited liability company, | Case No. 3:25-CV-00656 |
| Plaintiff, | **COMPLAINT** |
| v. | JURY TRIAL DEMANDED |
| ESHA RESEARCH, LLC**,** an Oregon limited liability company, | |
| Defendant. | |

1.    Plaintiff RLH Assets, LLC d/b/a Foodwit ("Foodwit") brings this complaint against ESHA Research, LLC ("ESHA") for declaratory relief and monetary damages as well as such other relief as specified herein, as follows:

## NATURE OF THE ACTION

2.      ESHA is an Oregon corporation based in Oregon.  Foodwit is also an Oregon corporation based in Oregon.  ESHA sued Foodwit in the District of Delaware on February 20, 2025, claiming "the calculated theft" of different "crown jewels," including a "software system called Genesis Foods."  Foodwit requests this relief under antitrust laws because ESHA has engaged in a campaign to intimidate its emerging competitors, including at least Foodwit, through baseless accusations and litigation against them for unspecified "theft" of ESHA's unspecified "crown jewels."  Since its acquisition and exponential price increases, ESHA has directly threatened new market participants through a series of escalating demands for the purpose of excluding them from the U.S. SaaS-based application for food-labeling compliance market.

## THE PARTIES

3.      Plaintiff RLH Assets, LLC d/b/a Foodwit ("Foodwit") is a limited liability company organized and existing under the laws of the State of Oregon, with its principal place of business in Portland, Oregon.

4.      Defendant ESHA Research, LLC ("ESHA") is a limited liability company organized and existing under the laws of the State of Oregon, with its principal place of business in Beaverton, Oregon.

## JURISDICTION AND VENUE

5.      This action arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, the Defend Trade Secrets Act, 18 U.S.C. §§ 1831-39, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

6.      This Court has subject matter jurisdiction over this action under 15 U.S.C. § 4, 28 U.S.C. § 1331, and 28 U.S.C. § 1337.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

7.     This Court has general personal jurisdiction over ESHA, a limited liability company organized and existing under the laws of the State of Oregon and a resident of this District.

8.     Venue is proper in this District under at least 28 U.S.C. § 1391(b)(1), because ESHA is a limited liability company organized and existing under the laws of the State of Oregon and a resident of this District.

## BACKGROUND

**A.     Food Companies Must Comply With Food Regulations; To Do So, Food Companies Must Combine Facts About Nutrients in Ingredients with the Applicable Federal, State, and Local Requirements for a Food Label**

9.     Companies preparing food commercially must comply with all applicable Federal, state, and local requirements.  To do so, among many other things, food companies must understand what nutrients are in the various ingredients of a product, and prepare food labels complying with applicable regulations to show information about the ingredients nutrients appearing in their products.

10.     This process has two inputs:  first, facts about what nutrients are in the various ingredients of a product; and, second, the Federal, state, and local requirements applicable to a food label.

**B.     Facts About Nutrients in Ingredients Are Commonly in the Public Domain**

11.     To obtain the first of these two inputs, facts about what nutrients are in the various ingredients of a product, food companies can employ databases containing this information, solicit this information from their raw material suppliers, or use scientific knowledge about the nutrients in a food.

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

12.     Some databases containing facts about what nutrients are in the various ingredients of a product are in the public domain.

13.     These public-domain databases often contain sufficient information, when combined with publicly available applicable Federal, state, and local requirements, to generate a compliant food label.

14.     For example, the U.S. Department of Agriculture has been researching and publishing information on food nutrients for more than 100 years.  *E.g.*, https://www.sciencedirect.com/science/article/pii/S0002916522001794.

15.     Today, the Department of Agriculture maintains Food Data Central, a website available at https://fdc.nal.usda.gov/.  Among other things, Food Data Central includes five databases available to the public.

16.     The first of these databases is "Foundation Foods."  The Food Data Central website states that "Foundation Foods includes values for nutrients and other food components for a diverse range of basic foods (unprocessed or lightly processed foods) and provides extensive underlying metadata, including the number of samples, sampling location, date of collection, analytical approaches used, and if appropriate, agricultural information such as genotype and production practices."  (https://fdc.nal.usda.gov/Foundation_Foods_Documentation).  The Department of Agriculture updates this database twice a year, in April and October.

17.     The second of these databases is "SR Legacy."  The Food Data Central website states that "SR Legacy was the primary food composition database in the United States for decades.  It provides a comprehensive list of values for food components derived from analyses,

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

imputations, and the published literature." (*Id.*) Released by the Department of Agriculture in April 2018, SR Legacy is the final release of this data type and will not be updated.

18.     The third of these databases is "Food and Nutrient Database for Dietary Studies 2019-2020 (FNDDS 2019-2020)." The Food Data Central website states that "Food and Nutrient Database for Dietary Studies 2019-2020 (FNDDS 2019-2020) provides nutrient and food component values for the foods and beverages reported in What We Eat in America, the dietary intake component of the National Health and Nutrition Examination Survey (NHANES)." (*Id.*) The Department of Agriculture updates this database every two years.

19.     The fourth of these databases is "Experimental Foods." The Food Data Central website states that "Experimental Foods contains data on foods published in peer-reviewed journals, supported by or in collaboration with USDA." (*Id.*) The Department of Agriculture updates the Experimental Foods database twice a year, in April and October, as the data becomes available.

20.     The fifth of these databases is "USDA Global Branded Food Products Database (Branded Foods)." The Food Data Central website indicates that "USDA Global Branded Food Products Database (Branded Foods) contains data from a public-private partnership whose goal is to enhance the open sharing of nutrient data that appear on branded and private label foods and are provided by the food industry." (*Id.*) The Department of Agriculture updates this database monthly. (*Id.*)

21.     These and other databases in the public domain provide information sufficient to provide the first of the two inputs into a compliant food label: facts about what nutrients are in the various ingredients of a product.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

22.     For example, the *New York Times* maintains a popular Cooking section, and tracks its most popular recipes at https://cooking.nytimes.com/68861692-nyt-cooking/13395693-our-%2050-most-popular-recipes-of-all-time-so-far.

23.     As of the filing of this complaint, the five recipes at the top of the *New York Times* list of "Most Popular Recipes of All Time (So Far)" are:  Creamy Macaroni and Cheese (https://cooking.nytimes.com/recipes/1015825-creamy-macaroni-and-cheese, Ex. 1), Roasted Salmon Glazed with Brown Sugar and Mustard (https://cooking.nytimes.com/recipes/1017244-roasted-salmon-glazed-with-brown-sugar-and-mustard, Ex. 2), Takeout-Style Sesame Noodles (https://cooking.nytimes.com/recipes/9558-takeout-style-sesame-noodles, Ex. 3), Classic Marinara Sauce (https://cooking.nytimes.com/recipes/1015987-classic-marinara-sauce, Ex. 4), and Chocolate Chip Cookies (https://cooking.nytimes.com/recipes/1015819-chocolate-chip-cookies, Ex. 5).

24.     If these five recipes were commercial food products instead of recipes, the databases maintained by the U.S. Department of Agriculture available at Food Data Central would provide sufficient information, when combined with the applicable Federal, state, and local requirements, to generate compliant nutrition labels for all five.

**C.     The Law Is Always in the Public Domain**

25.     The law is always in the public domain.

26.     Federal, state, and local requirements for food labeling are laws or regulations with the force of law.

27.     Federal, state, and local requirements for food labeling are always in the public domain.

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

**D.      When Information Is Available in Databases Available from the Department of Agriculture, It Is in the Public Domain**

28.      To prepare food labels complying with applicable regulations to show information about the ingredients, nutrients appearing in their products, food companies must combine facts about what nutrients are in the various ingredients of a product with the Federal, state, and local requirements applicable to a food label.

29.      For example, consider the recipe at the top of the *New York Times* list of "Most Popular Recipes of All Time (So Far)," entitled "Creamy Macaroni and Cheese" (https://cooking.nytimes.com/recipes/1015825-creamy-macaroni-and-cheese, Ex. 1).  If "Creamy Macaroni and Cheese" were a commercial food product for sale, it would require a label conforming with applicable Federal, state, and local requirements.

30.      To prepare that label, a food company would first gather information regarding the nutrients in the various ingredients of the product.  The necessary information is available from the USDA's Food Data Central website, as set forth below:

| Ingredient | Measure | USDA Food Data Central link |
|---|---|---|
| Unsalted butter | 2 tablespoons | https://fdc.nal.usda.gov/food-details/173430/nutrients |
| Cottage cheese | 1 cup (not low-fat) | https://fdc.nal.usda.gov/food-details/2346384/nutrients |
| Milk | 2 cups (not skim) | https://fdc.nal.usda.gov/food-details/746782/nutrients |
| Dry mustard | 1 teaspoon | https://fdc.nal.usda.gov/food-details/170929/nutrients |
| Ground cayenne | pinch | https://fdc.nal.usda.gov/food-details/170932/nutrients |
| Ground nutmeg | pinch | https://fdc.nal.usda.gov/food-details/171326/nutrients |
| Kosher salt | ½ teaspoon | https://fdc.nal.usda.gov/food-details/173468/nutrients |
| Black pepper | ¼ teaspoon | https://fdc.nal.usda.gov/food-details/170931/nutrients |
| Cheddar, grated, sharp or extra-sharp | 1 pound | https://fdc.nal.usda.gov/food-details/173414/nutrients |

Page 7 - COMPLAINT

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

| Ingredient | Measure | USDA Food Data Central link |
|---|---|---|
| Elbow pasta (uncooked) | ½ pound | https://fdc.nal.usda.gov/food-details/169736/nutrients |

31.     Using information from the pages linked on this table, a food company could prepare nutrition labels compliant with Federal, state, and local requirements.

32.     All of the inputs to this food label are in the public domain: the facts about what nutrients are in the various ingredients of a product are available from public-domain databases available from the Department of Agriculture, and the applicable regulations are laws that are always in the public domain.

**E.     When Information Is Not in Databases Available from the Department of Agriculture, It Is Nevertheless in the Public Domain**

33.     Sometimes, preparation of a food label includes information that is not listed in public-domain databases available from the Department of Agriculture. For example, consider again the "Creamy Macaroni and Cheese" recipe, Ex. 1. That recipe calls for, among other things, "½ pound elbow pasta (uncooked)" and "1 pound sharp or extra-sharp Cheddar, grated." While the Department of Agriculture database includes an entry for "elbow pasta" and "cheddar cheese," it may not include a specific entry for every brand of those food products.

34.     If a company chose to use a specific brand of Cheddar cheese or elbow pasta, nutrition information about that brand thus might not be available in public-domain databases available from the Department of Agriculture. But the information would still be in the public domain because it is available on the brand manufacturer's website, on food labels directly on the packaging of the specific brand of Cheddar cheese or elbow pasta, or both.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

**F.      Preparing a Food Label Requires Calculations Prescribed by Laws and Regulations**

35.      To prepare a food label for "Creamy Macaroni and Cheese" compliant with Federal, state, and local requirements, a food company would take the weights and measures in the recipe, set forth in the second column of the table in paragraph 30 above, combine that with the information found at the links in the third column of the table, and generate nutrient information for each ingredient in the recipe.

36.      A food company would then take the nutrient information for each ingredient in the recipe, and calculate the sum of each of those nutrients according to the weights and measures in the recipe.

37.      Having generated this information, the food company must turn it into a compliant food label.  To do so, it must calculate, round, and present the information on its food label in a format compliant with Food and Drug Administration ("FDA") regulations.

38.      FDA food labeling regulations set forth rounding rules, conversion factors, and visual template requirements for various types of food labels and components of those labels. For example, 21 CFR § 101.9(c)(6) sets forth how to calculate total carbohydrates by subtracting the weight of crude protein, total fat, moisture, and ash from the total weight of the sample of food.  Many other regulations set forth how to perform many other calculations.  By applying the calculations required by the regulations to the nutrients in the recipe, a food company could prepare a compliant food label for "Creamy Macaroni and Cheese."

**G.      Preparing a Food Label Can Be Done Manually, or Automated in Various Ways**

39.      One can do all of these required calculations on paper.  Or, if one prefers greater automation of this process, she can do some or all of the calculations on a spreadsheet such as Microsoft Excel.  Or, if one prefers even greater automation of this process, she can use a

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

computer application to perform these calculations. In the latter case, she could specify the information in the table in paragraph 30 above, and the computer application would perform the calculations and output a compliant food label.

40.     Whether performed on paper, with a spreadsheet, or with a computer application, the task would be the same: apply public-domain laws and regulations to public-domain facts. And the calculations necessary to complete this task would be the same.

41.     Indeed, the calculations to complete this task must be the same, because those calculations implement applicable laws and regulations, and therefore must follow their strictures. *See supra* ¶¶ 35-38.

**H.     ESHA's Founding and Operation as a Family-Owned Business**

42.     ESHA was founded in 1981, named after its founders Elizabeth Stewart Hands and Associates. (https://blog.trustwell.com/history-of-the-nutrition-facts-label-celebrating-30-years-of-genesis-rd).

43.     In 1991, ESHA introduced a product called Genesis R&D Food Development and Labeling Software, known as "Genesis."

44.     Genesis is a software application that performs the functionality described above in Paragraphs 35-38: it generates compliant food labels from a list of ingredients. The main functionality of Genesis is to generate compliant food labels based on user selections of nutrition records already in its database, user-generated nutrition records containing the user's own data entry, or both.

45.     ESHA was one of the first companies to market with a software application that generates compliant food labels from a list of ingredients. Although ESHA's Genesis product performed calculations a human being could do on paper, it automated some of those

Page 10 - COMPLAINT

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

calculations and thus made the process of generating a compliant food label more convenient for its users.

46.    As a result, users were willing to pay ESHA to use Genesis.

47.    Many users did, and because ESHA was early to market and there were few if any viable alternatives, many users became dependent on Genesis.  ESHA itself acknowledges as much, and indeed emphasizes its share of the market.  For example, ESHA's publicly available manual for Genesis states:  "The program has been used by 80 percent of the top food producers and developers in the United States for quick and accurate nutrient evaluation, virtual product development, nutrition labeling, and government regulation compliance."

https://esharesearch.atlassian.net/wiki/spaces/FP/pages/84277312/Getting+Started.  And during a launch event for Genesis in April 2023, ESHA stated that Genesis was then "Serving more than 80% of the top food producers and developers in the US."

https://info.trustwell.com/hubfs/genesis-webinars/2023.04.25-Genesis-Launch-Event.pdf.  On July 7, 2023, ESHA emailed Foodwit a proposal including the statement that "For over 35 years, we have been the most trusted source in the food industry and the leading provider of nutrition analysis, formulation and labeling software solutions in the market."  And even today, ESHA's website includes the claim that ESHA has a large market share:



SERVING MORE THAN 80% OF THE TOP
FOOD PRODUCERS AND DEVELOPERS IN THE U.S.

**Trustwell By the Numbers**

https://www.trustwell.com/why-trustwell/.

Page 11 - COMPLAINT

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

I.      **ESHA's Database Contains Information in the Public Domain**

48.     ESHA's Chief Executive Officer, Katy Jones, has testified to this Court that
ESHA "maintains a suite of highly confidential and proprietary nutritional data and related
information that are widely recognized as the industry's top choice for food and supplement
formulation, recipe development, labeling, nutritional analysis, and regulatory compliance."
*ESHA Research, Inc. v. Cronometer Software, Inc.*, Case No. 24-1586, Docket No. 31 ¶ 5 (D. Or.
Mar. 28, 2025).

49.     Ms. Jones has further testified to this Court that one of ESHA's "most protected
assets is its food and nutrition database, which contains an extensive compilation of nutritional
values and related data used for nutritional analysis, including comprehensive nutritional
breakdowns for up to 172 separate data fields, including proximates, vitamins, minerals, amino
acids, and other nutrient components, for more than 90,000 brand name and generic foods and
ingredients.  This database represents a highly confidential and proprietary compilation and
particular selection of data from multiple sources, including a substantial volume of ingredient
components and related data that Trustwell itself created, supplemented, and/or augmented, that
are not publicly available."  *Id.* ¶ 6.

50.     Ms. Jones does not further define what she means by "substantial volume."  *Id.*

51.     Some of the entries in ESHA's food and nutrition database come from public
sources.

52.     Some of the entries in ESHA's food and nutrition database are identical to
publicly available information such as information from the databases on the Food Data Central
website, or from commercial food labels.

Page 12 - COMPLAINT

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

**J.      Foodwit's Founding and Operation**

53.      Foodwit's founder, Becki Holmes, has worked in the food industry since 2006. She holds a Bachelor of Science in Food Science & Human Nutrition, a Master of Science in Pharmacology & Toxicology, and is a registered and licensed dietitian.

54.      Before founding Foodwit, among other roles, Ms. Holmes served as Head of Scientific & Regulatory Affairs at Red Bull and worked in Global Regulatory Affairs at Starbucks, building extensive expertise in navigating regulatory frameworks governing the food industry.

55.      In addition, Ms. Holmes has a long history of automating what would otherwise be very manual regulatory tasks.  In her first role at Starbucks, she was tasked with managing digital and print publications for thousands of beverage customizations for the Starbucks menu and hundreds of regional menus that required routine updates often four to six times a year.

56.      In her role at Starbucks, Ms. Holmes used Genesis R&D among other software. Ms. Holmes' work was labor-intensive and prone to error when using Genesis R&D.  During her tenure at Starbucks, Ms. Holmes was the business lead responsible for developing an internal web application that helped verify, automate, and publish product data directly to Starbucks.com. She was also the business lead responsible for garnering cross-functional support to acquire, customize and implement an enterprise-wide product launch management software product. This role began Ms. Holmes' history of digitalizing regulatory compliance work and solving problems that ESHA and Genesis R&D couldn't solve.

57.      During her ten years in the food industry before founding Foodwit, Ms. Holmes observed that the food industry was missing a way to effectively outsource food safety and regulatory services in a fractional way.  In 2016, she founded Foodwit to bridge the gap between

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

large global consulting, testing, inspection, and certification firms and independent consultants. Foodwit's consultants have served in in-house R&D, regulatory, or food safety and quality roles that give them perspective on what's possible for its clients, including technology related to the day-to-day operations of a compliance professional.

58.     Since its founding in 2016, Foodwit has provided regulatory and food safety managed consulting services.  Its three foundational service pillars include: regulatory compliance; food safety; and quality and growth strategy, which includes emerging regulatory changes, and organizational and operational optimization initiatives.

59.     Core to its problem-solving approach is Foodwit's ability to advise clients on their unique problems and identify what can be improved through software and process.  These solutions can be either off-the-shelf or bespoke solutions combined with process and change management.  Foodwit's clients have benefited from Foodwit's technology-forward consulting capabilities including automating the publication of thousands of recipes annually, and advising clients on what software products could benefit and streamline their operations—including ESHA Genesis R&D software.

60.     Foodwit's clients have recognized its success. Since its founding in 2016, Foodwit's client base grew an average 64% annually.  In 2021, when Foodwit surveyed its clients, 97% said they would recommend Foodwit to a colleague or friend.

**K.     Foodwit's Use of Genesis**

61.     In order to serve its clients, Foodwit wished to use a software application to assist with building compliant food labels.  Ms. Holmes had used Genesis before founding Foodwit, and remembered it as the industry leader.

Page 14 - COMPLAINT

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

62.     On May 4, 2016, Ms. Holmes filled out ESHA's online quote request form.  Later

that same day, Benjamin Miller of ESHA emailed Ms. Holmes to offer her various subscription

options, including a Consultant License, explaining that:

> The ESHA Consulting License provides full access to all Genesis R&D Food
> modules, on an annual subscription basis.  Package includes ESHA Port utility, priority
> support, and updates.  The annual cost is $3,499.  In addition, our Genesis consultant has
> the option to be exclusive Genesis software resellers.  As a reseller, you can sell Genesis
> to customers at standard rates and receive a 30% reimbursement for each software sale.
> This program lets you have everything ESHA Genesis offers at a discounted rate to assist
> in building your business with ESHA's 30 plus years of expertise as a leader in nutrition
> labeling and formulation software as your partner.

Ex. 6.

63.     Mr. Miller and Ms. Holmes continued to discuss by telephone the terms on which

Foodwit might subscribe to Genesis.  On May 9, 2016, Mr. Miller sent Ms. Holmes an email

including a "Commercial Software License for companies and consultants," which incorporated

the "Standard ESHA Software EULA," and a copy of that "End User License Agreement."

Ex. 7.

64.     Paragraph 20 of the End User License Agreement, entitled "Governing Law,"

stated that "This Agreement shall be governed by and construed in accordance with the laws of

the state of Oregon without regard to, or application of, any conflict of law provisions."

65.     Paragraph 21 of the End User License Agreement, entitled "Jurisdiction, Venue,"

stated that "The parties agree that any suit, action or arbitration proceeding arising out of or

relating to this Agreement shall be brought in Multnomah County, Oregon, and the parties

expressly consent to the personal jurisdiction over them of any state or federal court in

Multnomah County, Oregon."

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

66.    Paragraph 22 of the End User License Agreement, entitled "Attorneys' Fees," stated that "If either party to this Agreement breaches any term of this Agreement, then the other party shall be entitled to recover all expenses of whatever form or nature, costs and attorneys fees reasonably incurred to enforce the terms of the Agreement, whether or not suit is filed, including such costs or fees as may be awarded in arbitration or by a court at trial or on appeal."

67.    Paragraph 25 of the End User License Agreement, entitled "Amendments," stated that "This Agreement may be amended or modified only by a written instrument executed by the parties which expressly states the intent of the parties to modify or amend this Agreement."

68.    On August 14, 2017, Ms. Holmes again filled out ESHA's quote request form. The following day, August 15, 2017, Mr. Miller again emailed Ms. Holmes in response.  Ex. 8. This time, remembering their previous conversation, Mr. Miller stated:

> The ESHA Consulting License provides full access to all Genesis R&D Food modules, on an annual subscription basis.  Package includes ESHA Port utility, priority support, and updates.  Attached is pricing information.  In addition, our Genesis consultant has the option to be exclusive Genesis software resellers.  As a reseller, you can sell Genesis to customers at standard rates and receive a 30% reimbursement for each software sale.  This program lets you have everything ESHA Genesis offers at a discounted rate to assist in building your business with ESHA's 30 plus years of expertise as a leader in nutrition labeling and formulation software as your partner.

*Id.*

69.    On August 30, 2017, Ms. Holmes confirmed that Foodwit would like to proceed with a subscription to Genesis, and provided a completed form selecting the $3,499 base configuration.  Ex. 9.

70.    Later that day, Mr. Miller responded that Foodwit must also fill out the "ESHA Cloud Registration Form," which he linked to https://www.esha.com/esha-cloud-registration/. Ex. 10.  The page that Mr. Miller referenced is no longer available on the Internet but the Internet Archive maintains a copy at

Page 16 - COMPLAINT

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

https://web.archive.org/web/20170827011806/http://www.esha.com/ esha-cloud-registration/.

That page requires the user to check a box stating "I agree to the Terms of Service" before hitting

"Submit."  The link to the "Terms of Service" is no longer functional, but Foodwit previously

downloaded the document linked there, and attaches it as Ex. 11.  Foodwit executed the form,

and Ms. Holmes confirmed to Mr. Miller that she had done so.  Ex. 12.

71.    Paragraph 20 of the End User License Agreement, entitled "Governing Law,"

stated that "This Agreement shall be governed by and construed in accordance with the laws of

the state of Oregon without regard to, or application of, any conflict of law provisions."

72.    Paragraph 21 of the End User License Agreement, entitled "Jurisdiction, Venue,"

stated that "The parties agree that any suit, action or arbitration proceeding arising out of or

relating to this Agreement shall be brought in Multnomah County, Oregon, and the parties

expressly consent to the personal jurisdiction over them of any state or federal court in

Multnomah County, Oregon."

73.    Paragraph 22 of the End User License Agreement, entitled "Attorneys' Fees,"

stated that "If either party to this Agreement breaches any term of this Agreement, then the other

party shall be entitled to recover all expenses of whatever form or nature, costs and attorneys

fees reasonably incurred to enforce the terms of the Agreement, whether or not suit is filed,

including such costs or fees as may be awarded in arbitration or by a court at trial or on appeal."

74.    Paragraph 25 of the End User License Agreement, entitled "Amendments," stated

that "This Agreement may be amended or modified only by a written instrument executed by the

parties which expressly states the intent of the parties to modify or amend this Agreement."

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

75.    On January 22, 2018, Foodwit requested a second Genesis license.  Ms. Holmes again completed the Cloud Registration Form and agreed on Foodwit's behalf to the same End User License Agreement.

76.    On February 5, 2018, Foodwit requested a third Genesis license.  Ms. Holmes again completed the Cloud Registration Form and agreed on Foodwit's behalf to the same End User License Agreement.

77.    Foodwit and ESHA maintained a long-standing relationship.  Foodwit regularly referred substantial corporate clients to Genesis.

78.    Between 2018 and 2023, Foodwit received invoices and paid them, but never received or executed any documents referring to any contract terms.

79.    On August 30, 2023, Foodwit executed its last renewal of Genesis.

80.    The renewal invoice, Ex. 13, referred to the "[ESHA] Web Application Terms of Services and End User License Agreement ('Agreement')."  But ESHA did not transmit any new terms of service document with the renewal invoice.  And the renewal invoice did not indicate it was modifying the previous terms and conditions.

81.    Foodwit made its final payment to ESHA on January 15, 2024.

**L.    Foodwit Uses ESHA's Genesis Product**

82.    To support its consulting work, Foodwit used Genesis to develop compliant labels for packaged foods.  In so doing, Foodwit experienced difficulties with the Genesis software, including performance downtime, slow performance, and a clunky interface.  In addition, the core Genesis product failed to meet many of Foodwit and its clients' needs for basic regulatory compliance.  To achieve its clients' objectives, Foodwit often had to rely on other tools,

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

including spreadsheets and manual workarounds.  Foodwit raised these topics with ESHA, but ESHA declined to make improvements to the product.

**M.    Private Equity Acquires ESHA**

83.    On March 1, 2022, The Riverside Company ("Riverside") acquired ESHA.

84.    Riverside is a "global private equity firm focused exclusively on the smaller end of the middle market" and "has honed its approach to sourcing 'little leading' companies." https://www.riversidecompany.com/private-equity/.

85.    In Riverside's announcement of the ESHA transaction, Riverside Managing Partner Loren Schlachet stated that "ESHA has an industry-leading solution that a broad base of blue-chip customers, including many of the largest food and beverage manufacturers in the world, rely on."  https://www.riversidecompany.com/currents/riverside-cooks-up-another-savory- deal-with-latest-investment/.  Mr. Schlachet continued:  "It's a compelling, mission-critical value proposition that drives deep loyalty and consistent recurring revenue."  *Id.*

86.    ESHA's advisor in the same transaction, RA Capital, stated that "ESHA's one-of-a-kind SaaS platform has helped 75 of the top 100 F&B [food and beverage] manufacturers achieve regulatory compliance."  https://raca.com/esha-research-acquired-by-the- riverside-company/.

**N.    Now Owned by Private Equity, ESHA Jacks Up Its Prices**

87.    Riverside and ESHA did not stray too far from the stereotype of private equity.

88.    In 2023, ESHA embarked on a strategy of price increases.

89.    These price increases were steep.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

90.     Although Foodwit does not have nearly complete information on ESHA's price

increases, on information and belief, many of ESHA's new prices were between five and ten

times higher than ESHA's old prices.

91.     ESHA's price increases led to complaints among its customers.

92.     Worried about the price increases but fearful of retaliation by ESHA, some

customers posted anonymously on Reddit's "Food Science" subreddit, which calls itself "A

professional place to discuss questions regarding food science and technology, as well as the

greater food industry."  https://www.reddit.com/r/foodscience/.

93.     For example, on October 24, 2023, u/penny3315 posted:

> Any one else get a ridiculous cost increase with Genesis being sold to
> Trustwell?  Our cost went up more than 5 times with their new pricing structure.
> I feel like they are forcing it down our throats because they know there is no
> viable alternative.

https://www.reddit.com/r/foodscience/comments/17fsm2f/.  The same user posted more detail

three days later:

> We were blind-sided by the Esha's new parent company "Trustwell" to their very
> shady new pricing structure. You will get notice of this about a month before your
> renewal date.
>
> - "Base" cost increase goes up to $10,000
>
> That brought our current renewal from roughly $8,000 to more than $40,000.
> Without all of their made up "discounts" to make you "feel like you're getting a deal" the
> cost would be $96,305.
>
> All of my interactions questioning this new price structure have left a very bad
> taste in my mouth. Lots of empty promises and copy paste responses about great
> improvements with the new "Trustwell" merge- but no substance. Basically a feeling of –
> "we know we are the platform everyone uses...so suck it up and pay"

https://www.reddit.com/r/foodscience/comments/17hsytf/.

94.     On November 4, 2023, u/Not_ESHA posted:

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

In May they started releasing their new prices for customers who renewed that month.  Tactically they did this at the last minute to create anxiety, pressure, hatred, grief, name-your-emotion.  The numbers that you quote are accurate (a 5x increase above what you were paying before) but will [sic] all of these gimmicks to entice you to renew.

https://www.reddit.com/r/foodscience/comments/17hsytf/.

95.     On November 23, 2023, u/Adorable_Recipe4699 posted:

My jaw nearly hit the floor when I saw a $20k quote to "repurchase" a software license which we paid $6k for in 2005 from Scott and have been paying $3500/yr ever since.

https://www.reddit.com/r/foodscience/comments/17aei1h/.

96.     On information and belief, all of ESHA's customers that renewed in 2023 paid substantial price increases.

97.     Like ESHA's other customers, Foodwit suffered from this price increase.  Foodwit's price for three licenses to Genesis was $6,497.00 in 2020 and 2021; in 2022 it went up to $8,447.00, a 30% increase.  In 2023, ESHA offered Foodwit the same three licenses at an increase of almost ten times, then offered "discounts" from this inflated price.  Without an alternative, Foodwit reduced the functionality of its licenses and eventually ended up paying for one year at $34,380.50, representing a 307% increase over 2022 and a 429% increase over 2021.

98.     ESHA also used pressure tactics against its customers.  It delayed offering renewal terms until shortly before a customer's renewal date, thus decreasing its ability to find alternatives in the short time available for negotiations.

99.     Foodwit suffered from these tactics as well.  Foodwit attempted to extend its existing license through the end of 2023; ESHA delayed its response until the renewal date approached, pressuring Foodwit to renew for one more year.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

**O.    Customers Respond to ESHA's Price Increase by Seeking Alternatives**

100.    The new private equity ESHA's massive price increase had the effect taught in Economics 101:  customers started looking for alternatives.

101.    ESHA did everything it could to stop this exodus.  It denied many Genesis customers' requests to export their data, claiming that food-label data was proprietary to ESHA because it came from ESHA's Genesis software—even though ESHA's Genesis software only performed the calculations required by applicable regulations.

102.    And even for customers who had specifically reserved the ability to export their data by paying extra for a product called "ESHA Port," ESHA provided only customer-generated content in a format incompatible with any other platform without significant manual revision, putting up artificial barriers to switching.  ESHA's export format likewise enforces artificial data logic, for example default allergen tags on food records, requiring manual and labor-intensive reviews to avoid inaccurate data exports.

103.    On information and belief, ESHA sought to entrap customers into Genesis contracts through a trust-me two-step.  As a customer's renewal date approached, if ESHA and the customer could not agree on a price, ESHA would promise the customer an extension of the renewal date to allow for further negotiations.  Relying on this promise, the customer would not take action to find an alternative to Genesis.  Shortly before the original renewal dates, ESHA would then renege on its promise of an extension, forcing the customer to renew at ESHA's inflated prices or face the loss of its data and its access to any food labeling tool.

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

**P.**    **Foodwit Responds to ESHA's Price Increase by Developing Workbench**

104.    The new private equity ESHA's massive price increase had another effect taught in Economics 101:  at least one other company, Foodwit, developed a competitive product, called Workbench.

105.    Private equity ESHA realized too late what family-business ESHA knew all along:  it could not raise its prices too much without driving customers away and encouraging competition.

106.    But private equity ESHA had a backup plan:  litigation.  Through Riverside, it had sufficient resources to threaten and bring litigation.  ESHA did not care whether litigation was justified or not.  It did not care whether its claims were valid.

107.    In fact, ESHA has used this aggressive litigation tactic towards other competitors. In September 2024, ESHA filed suit against Cronometer, a web and mobile-based nutrition tracking app, in *ESHA Research, Inc. v. Cronometer Software, Inc.*, Case No. 24-1586, Docket No. 1 (D. Or. September 18, 2024).  ESHA claimed that their agreement with Cronometer allowed them to use ESHA data for "its own internal analyses" and not to build the data into its product.  On December 17, 2024, Cronometer counterclaimed against ESHA for declaratory judgment and violations of federal antitrust laws.  *ESHA Research, Inc. v. Cronometer Software, Inc.*, Case No. 24-1586, Docket No. 6 (D. Or. December 17, 2024).

**Q.**    **ESHA Tries to Intimidate Foodwit with Vague and Baseless Claims, Supported by a Purported Contract that Contains Internal Drafting Comments**

108.    On August 6, 2024, ESHA sent Foodwit a "Demand to Cease and Desist" letter. Ex. 14.  The letter stated that ESHA's "proprietary software and database contains and embodies highly confidential and trade secret information," and accused Foodwit of "secretly using

Page 23 - COMPLAINT

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

[ESHA's] confidential and proprietary data to create and launch Workbench," but provided no

specifics regarding what "confidential and proprietary data" Foodwit supposedly stole.

109.    In reality, of course, the answer is "none."  Foodwit's Workbench product did not

use ESHA's "highly confidential and proprietary nutritional data and related information."

Instead, Foodwit developed its computational algorithms for over six months using its decades of

industry experience.  Foodwit did not need to use any "highly confidential and proprietary

nutritional data and related information" because it has access to readily-available data from

public domain sources such as the Food Data Central website to perform calculations on that

data as required by applicable laws and regulations—which are also in the public domain.

110.    ESHA's "Demand to Cease and Desist" letter followed ESHA's usual pressure

tactics, demanding a response in three days and threatening, in the absence of capitulation, "to

take all appropriate legal action."  *Id.*

111.    On August 9, 2024, Foodwit responded to ESHA.  Ex. 15.  Foodwit confirmed

that it had not done anything wrong:

> While it is true that Foodwit has developed a product called Workbench, Foodwit
> takes intellectual property rights seriously and finds the allegations described in the Cease
> and Desist Letter offensive and patently false.  It has not "secretly" been using any of
> [ESHA's] assets to create a competitive product, it has not been reverse engineering any
> of [ESHA's] software, and it has not been engaging in any of the other nefarious
> activities described in the Cease and Desist Letter.
>
> . . . .
>
> The Cease and Desist Letter provides no evidence of Foodwit's breach of any
> laws or the License Agreement and it provides no evidence of "irreparable harm"
> incurred by [ESHA]. Because only baseless accusations were provided, we are forced to
> conclude that the Cease and Desist Letter is nothing but a bullying tactic intended to
> scare and forcibly silence a small and upcoming player in the industry.

*Id.*

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

112.    On September 17, 2024, ESHA sent a letter captioned "Final Attempt to Avoid Litigation" enclosing a draft complaint.  Ex. 16.  The draft complaint alleged that "Workbench is based on and derived from Genesis Foods" because (among other things)" it was a "SaaS-based application" that allowed users to "Build and scale recipes from ingredients" and generate a "Nutrient fact panel displayed with recipe formulation" that users could download and print."  *Id.*

113.    ESHA's draft complaint thus took the view that any "SaaS-based application" allowing users to generate compliant food labels was "derived from Genesis Foods" and thus improper.

114.    ESHA's draft complaint thus took the view that no company that had ever used Genesis Foods could develop a product competing with Genesis Foods.

115.    To support its claim of jurisdiction in Delaware, ESHA's draft complaint attached a purported contract captioned "ESHA RESEARCH TERMS OF SERVICES AND END USER LICENSE AGREEMENT."

116.    Foodwit had never seen this document before.

117.    And no wonder:  this document was not a contract between ESHA and Foodwit. It was not a contract between ESHA and anyone; it was not even a final document.

118.    This non-final document contained multiple comments confirming that ESHA was still drafting it in February 2024—after Foodwit renewed Genesis for the final time, and after Foodwit made its final payment to ESHA.

119.    In one comment dated February 1, 2024, Stephen Bruce wrote:  "The indemnification for Licensee Data would include claims beyond IP infringement, for example data access claims for Personal Data."  In another comment also dated February 1, 2024, Mr. Bruce wrote:  "Added to mutual warranties below."

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

120.    Stephen Bruce was the CEO of ESHA from February 2023 until February 2024.

121.    On September 24, 2024, Foodwit responded to ESHA's "Final Attempt to Avoid Litigation" by reconfirming that "Foodwit did not use nor rely on [ESHA's] proprietary software to build its Workbench product" and "Foodwit did not have access to use or misappropriate any of your client's trade secrets."  Ex. 17.  Foodwit further stated that, "if your position is that the entire Genesis Foods platform, when taken as a whole, is a trade secret, we do not see how any court could reach this conclusion since its functions are derived from publicly available information and the platform's features are obvious and commonplace."  *Id.*

**R.    Foodwit Asks ESHA to Identify What Exactly Foodwit Supposedly Stole; ESHA Repeatedly Dodges the Question**

122.    Foodwit then asked ESHA a seemingly simple question:  what exactly did ESHA think Foodwit stole?  On October 9, 2024, Foodwit emailed ESHA to ask this question:

> We would like to keep working together to assure [ESHA] that Foodwit has not violated any obligation to [ESHA].  For those discussions to be constructive, Foodwit must have confidence that they can lead to an amicable and definite resolution.  To achieve this confidence, we must understand what you are looking for, and what specific aspects of Workbench you believe may violate any obligations Foodwit has to [ESHA], and receive your confirmation that, if the Workbench product does not include any of those specific aspects, [ESHA] will consider this matter closed and both [ESHA] and Foodwit can move forward in the marketplace. . . . Without these assurances, we have no way to confirm that [ESHA] is not on a fishing expedition.

Ex. 18.

123.    On October 10, 2024, ESHA responded to propose an "escrowed data room, in which we could inspect Workbench."  Ex. 19.

124.    On October 15, 2024, Foodwit responded to ESHA to ask its question again:  "In my email of October 9, I explained exactly what we are looking for in our discussions:  the specific aspects of Workbench you believe may violate any obligations Foodwit has to [ESHA],

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

and your confirmation that, if Workbench does not include those specific aspects, we can consider this matter closed so that both [ESHA] and Foodwit can move forward in the marketplace.  Your below reply did not address this question at all.  I hope you will be prepared to do so when we talk by phone."  Ex. 20.

125.    Later on October 15, 2024, ESHA replied to Foodwit, stating:  "Under no circumstance would we be willing disclose to you the specific proprietary and trade secret items we'd be looking for in the inspection."  Ex. 21.

126.    ESHA thus refused to tell Foodwit what ESHA claimed that Foodwit had stolen from ESHA.

127.    ESHA's position made no sense if ESHA actually knew what it claimed Foodwit had stolen.  If ESHA knew that Foodwit had already stolen something from ESHA, ESHA would suffer no harm by telling Foodwit what Foodwit had already stolen.  Indeed, ESHA would benefit if Foodwit realized its error after learning the specifics.  If ESHA knew what it claimed Foodwit had stolen, telling Foodwit was all upside and no downside.

128.    Conversely, ESHA's position made complete sense if ESHA didn't know what Foodwit had stolen, or indeed if Foodwit had stolen anything at all, and was claiming it did know in bad faith.  Under those circumstances, ESHA's refusal to tell Foodwit what it had allegedly stolen would preserve ESHA's ability to claim later, presumably after litigation and discovery, that whatever it found in Foodwit's files happened to be ESHA's crown jewels.

129.    On November 11, the CEOs of ESHA and Foodwit spoke by telephone.  During that call, the CEO of Foodwit explained to the CEO of ESHA that, if ESHA truly believed that Foodwit had stolen its intellectual property, it should be eager to tell Foodwit precisely what it believed Foodwit had already stolen (and thus Foodwit already had).

Page 27 - COMPLAINT

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

130.    Initially, this seemed to work.  On November 14, 2024, ESHA CEO Katy Jones emailed Foodwit CEO Becki Holmes, stating that:

> Thank you again for the time earlier this week to discuss our issues related to protection of Trustwell's trade secrets.  I met with our counsel the week [sic] and wanted to follow up on next steps.
>
> We are now compiling a list of specific items we would like to review within your product to help us determine whether it may contain elements covered by Trustwell's IP.  This list will focus on verifying the uniqueness of certain Genesis features and proprietary Trustwell nutrition data.  Once we have that list finalized, I will circle back again with next steps on the process and approach for verification using that list.
>
> Thank you for keeping the lines of communication open as we work through this process. Please let me know if you have any immediate questions.

Ex. 22.

131.    But ESHA never provided this list.

132.    Instead, a month later on December 13, 2024, Ms. Jones wrote to make two new demands:  a "45-minute session to assess your product's functionality and data handling practices," and "a review of your software change logs for the removal of any features removed between August 1, 2024, and the date we receive the logs."  Ex. 23.

133.    On December 20, 2024, Ms. Holmes of Foodwit responded, to ask again for specifics:

> I worry that we have moved backwards from our phone call of November 11. . . . I proposed a solution, which my lawyer also proposed to your lawyer in October: [ESHA] can tell us what specific aspects of Workbench you believe may violate any obligations Foodwit has to [ESHA], and provide confirmation that, if the Workbench product does not include any of those specific aspects, [ESHA] will not further pursue legal action, and we can move forward with our businesses. . . . You seemed receptive to this idea, and said you would go back to your team to figure out specifics.

Ex. 24.

134.    Ms. Jones replied on December 31, 2024, stating that "what we have outlined is our requirement to resolve this matter without litigation."  Ex. 25.

Page 28 - COMPLAINT

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

135.     Following a call between Ms. Holmes and Ms. Jones, on January 18, 2025, Ms. Jones wrote Ms. Holmes to state that ESHA's "requests for resolution remain the same" but that ESHA would "Provide an advanced copy of the script on what we would like Foodwit to demo" and "Provide in writing that we will not pursue litigation if we do not find evidence of IP infringement during that demo."  Ex. 26.

136.     On February 6, 2025, Ms. Holmes replied:

I appreciate your willingness to discuss the matters between us, and, as I have explained before, we are willing to work with you on a process that would be fair to both [ESHA] and Foodwit.  Under the proposed process we discussed, [ESHA] would tell us what specific aspects of Workbench you believe may violate any obligations Foodwit has to [ESHA], and provide confirmation that, if the Workbench product did not include any of those specific aspects, [ESHA] would not further pursue legal action and we could both move forward with our businesses.  That process would give us what we want, which is an assurance that you're seeking to protect your rights instead of fishing for litigation or seeking to steal our intellectual property.  And it would give you what you say you want, which is the chance to confirm that we haven't violated any obligations to [ESHA], which I assure you we have not.  Back on November 14th of last year, you said in an email that you were compiling a list of specific items that you would like to review, but you never sent us this list and later confirmed that you refused to do so, returning to moving the target and threatening litigation.

Unfortunately, the proposal in your January email is not fair to both sides.  You propose to put in writing that you will not sue us if, in your subjective opinion, you conclude that there is no reason to sue us.  But that is always true, so writing it down provides no further assurance.  You suggest giving us the script for a demonstration in advance, but that too gives us nothing.  Our concern is not with the details of what a demonstration would cover, but with [ESHA's] purpose in seeking the demonstration to begin with.  We have repeatedly asked for specific allegations of wrongdoing, and you have repeatedly declined to provide them.  Without those specifics, we have no assurances regarding why you want to see Workbench in the first place; for all we know, you want to review Workbench to steal Foodwit's intellectual property.  We have pointed this out several times, but [ESHA] has never provided an explanation for its refusal.

Ex. 27.

137.     On February 20, 2025, ESHA filed an action against Foodwit in Delaware.  *ESHA Research, LLC v. RLH Assets, LLC*, Case No. 25-206, Docket No. 1 (D. Del.).

138.     A copy of ESHA's complaint is attached as Ex. 28.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

139.    A redline showing the differences between ESHA's draft complaint of September 2024 (Ex. 16) and its filed complaint is attached as Ex. 29.

140.    These differences are telling.

141.    The first telling difference between the draft complaint and the filed complaint concerns ESHA's claim of jurisdiction and venue in Delaware.  In the filed complaint, ESHA continues to claim that a "License Agreement" provides jurisdiction in Delaware.  *E.g.*, Ex. 28 ¶ 11.  But ESHA no longer attaches the work-in-progress February 2024 document that it previously claimed was the "License Agreement" binding Foodwit in August 2023.

142.    Instead, ESHA attaches no document whatsoever.  It simply claims that a "License Agreement" selecting Delaware jurisdiction still exists.

143.    On information and belief, after transmitting the draft complaint to Foodwit, ESHA realized that the work-in-progress February 2024 document that it previously claimed was the "License Agreement" had comments in it that proved that it could not govern any relationship between ESHA and Foodwit.  Instead of modifying its complaint, however, ESHA simply removed the embarrassing document and filed it anyway, fingers crossed that neither Foodwit nor the Courts would notice its failure to submit a binding contract on which its choice of venue was premised.

144.    As far as Foodwit can tell, the work-in-progress February 2024 document never became a contract binding anyone.  As of a week before the filing of this complaint, searching for the words "terms and conditions" on "trustwell.com" or "esha.com" yields exactly one hit, https://www.trustwell.com/wp-content/uploads/2025/01/ESHA-Cloud-Terms-and-Conditions.pdf which selects Oregon law and Oregon as the exclusive venue for disputes. (Archived at https://archive.is/sVVzh).

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

145.    But ESHA did not care whether the contract it alleged existed was binding on Foodwit or binding on anyone.  It filed the case anyway, because its purpose in doing so was not to win but to intimidate Foodwit.

146.    The second telling difference between the draft complaint and the filed complaint concerns ESHA's allegations of theft by Foodwit.  In the draft complaint, ESHA alleged that "this case is about the calculated theft of [ESHA's] crown jewels—the gold-standard software system called Genesis Foods . . . that Foodwit secretly accessed and used to help build and launch a competing product called Workbench."  Ex. 16 ¶ 2.  In the filed complaint, however, ESHA inserted "on information and belief" in this sentence.  Ex. 28 ¶ 2.  ESHA similarly added "on information and belief" before multiple allegations in the filed complaint of theft by Foodwit.  *E.g.*, Ex. 28 ¶¶ 25, 28.

147.    These allegations concern Foodwit's alleged use of ESHA's own software to "export[] a substantial volume of proprietary data" and other similar alleged thefts.  Ex. 28 ¶ 25.  But ESHA is in sole possession of its own software logs, which, if ESHA believed its own allegations, it would have verified to show exactly what Foodwit allegedly took, when and how.

148.    ESHA identifies no basis for its allegations because it has nothing.  This is no surprise, because Foodwit stole nothing.

149.    But ESHA went ahead and filed the complaint anyway.  After sending the draft complaint, ESHA apparently investigated to determine whether it had any support for the allegations in its draft.  It evidently concluded that it did not have any such support, but then filed the complaint anyway.  Again, ESHA did not care whether its allegations had any support.  It filed the case anyway, because its purpose in doing so was not to win but to intimidate Foodwit.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

## ESHA'S ATTEMPTS TO MAINTAIN ITS
## MONOPOLY POWER IN THE RELEVANT MARKET

150.     Foodwit and ESHA both operate in the United States market for Software-as-a-Service or SaaS-based applications for food-labeling compliance.

151.     The market for SaaS-based applications for packaged food-labeling compliance in the United States encompasses provision of software applications to generate regulatory-compliant label data for food packaging based on recipe ingredients.

152.     Products in the U.S. market for SaaS-based applications for packaged food-labeling compliance are reasonably interchangeable because they are functionally similar and provide similar U.S. nutrient calculations for the purpose of packaged food-labeling compliance, as they must in order to comply with applicable regulations.

153.     The U.S. market for SaaS-based applications for packaged food-labeling compliance encompasses the United States of America and its territories.  It does not encompass foreign markets for SaaS-based applications for packaged food-labeling compliance, as foreign regulatory schema and packaged food-labeling requirements vary significantly.

154.     The U.S. market for SaaS-based applications for packaged food-labeling compliance is highly concentrated, containing only a small handful of players, dominated by ESHA's Genesis product.

155.     ESHA has substantial and durable market power in the U.S. market for SaaS-based applications for food-labeling compliance.

156.     ESHA has repeatedly confirmed its dominant market position in the relevant market, including that it "serv[es] more than 80% of the top food producers and developers in the US," which form the substantial majority of the sales in the relevant market.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

157.    Upon its acquisition, ESHA immediately flexed its market power to control prices by increasing its prices 5x–10x, which it could only do because of a lack of available substitutes. ESHA's customers anonymously complained that ESHA was "forcing it down our throats because they know there **is no viable alternative**" and that ESHA's position to its customers was "we know **we are the platform everyone uses**...so suck it up and pay."

158.    There are significant barriers to entry in the U.S. market for SaaS-based applications for food-labeling compliance.  Although the data and laws on which food nutrient calculations are made are matters of public record, entry into the market requires substantial investment of time and cost to develop a scalable software solution to perform accurate and robust calculations.

159.    Other barriers to entry in the U.S. market for SaaS-based applications for food-labeling compliance include the need for domain expertise, including industry knowledge of nutrition data such as food chemical composition and the governing regulatory framework.

160.    Other barriers to entry in the U.S. market for SaaS-based applications for food-labeling compliance include customer entrenchment and risk aversion:  customers relying on one food-labeling compliance solution are reluctant to change providers because that change requires a substantial labor cost, upheaval of customer data, and attendant risks of operational disruptions and potential regulatory non-compliance.

161.    ESHA's dominant market share and name power further exacerbates customer lock-in; once a customer has input large quantities of recipe information into ESHA's SaaS-based application for food-labeling compliance, that customer can only switch solutions by first having a license to its add-on product called ESHA Port, and then transferring all of its data to a competitor's application, risking business disruptions, technical complications, and potential

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

regulatory risks.  Without access to ESHA Port, a customer must request an export of its data inputs within ten days of termination, and, if requested and received, those customer inputs are formatted to be unreadable on any platform other than ESHA's.

162.    The structure of the U.S. market for SaaS-based applications for food-labeling compliance demonstrates that ESHA possesses monopoly power in this market.  There are very few competitors, and no other company has any significant share of the market.  Demand is infrequent and inelastic because commercial food companies are required by law to label their packaging with nutrient data, and those companies do not regularly switch software vendors.

163.    Since its acquisition, ESHA has gone to great lengths to willfully maintain or attempt to maintain its monopoly position.

164.    For example, ESHA denied its customers access to their exported data—even those customers who had paid for that capability, specifically—to increase the risk of disruptions, complications, and potential regulatory risks to those customers in migrating to competitors.

165.    In another example, ESHA would entrap its customers by the false promise of an extension of their renewal dates, only to renege on that promise at the eleventh hour, forcing its customers to choose between paying a 10x markup for ESHA's SaaS-based application for food-labeling compliance or immediately lose access to their data before they had an opportunity to seek an alternative solution.

166.    Perhaps most egregiously, ESHA engaged in a campaign to intimidate its emerging competitors, including at least Foodwit, through baseless accusations and litigation against them for unspecified "theft" of ESHA's unspecified "crown jewels."  Since its acquisition and exponential price increases, ESHA has directly threatened new market

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

participants through a series of escalating demands for the purpose of excluding them from the

U.S. SaaS-based application for food-labeling compliance market.

## ESHA'S SHAM LITIGATION

167.    As set forth above, following its escalating threats, ESHA filed a complaint

against Foodwit in Delaware alleging multiple claims on the basis of "calculated theft of

Trustwell's crown jewels."

168.    No reasonable litigant could conclude that any claim within the as-filed ESHA

complaint has merit, as ESHA does not and cannot identify any colorable theory of "theft" of

any protected or protectable information.

169.    ESHA further subjectively believes its filed complaint lacks merit; indeed it

admits as much.  Where the draft complaint alleged factual matter outright, ESHA's as-filed

complaint admits its allegations are made wholly "on information and belief."

170.    On information and belief, ESHA has investigated the facts within its possession,

such as software logs, in an attempt to confirm accusations of "theft" and instead learned that its

allegations wholly lack merit.

171.    ESHA further subjectively believes its jurisdiction and venue allegations lack

merit.  Where the draft complaint included a work-in-progress February 2024 document that it

previously claimed was the "License Agreement," ESHA's as-filed complaint admits that no

"Licensing Agreement" selecting Delaware jurisdiction exists.

172.    On information and belief, ESHA realized the work-in-progress February 2024

document was not an executed agreement such that its venue and jurisdiction allegations wholly

lack merit.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

173.    ESHA's meritless litigation is an unlawful attempt to create barriers to entry into the relevant market.  By knowingly filing litigation without a single supporting fact setting forth what or when or how Foodwit allegedly stole ESHA's "crown jewels," and by knowingly suing in an improper venue, ESHA is engaged in sham litigation.

174.    ESHA's Delaware complaint is pretextual and brought for the purpose of driving up the cost of entry to the relevant market.

### ANTICOMPETITIVE EFFECTS OF ESHA'S ANTICOMPETITIVE CONDUCT

175.    ESHA has exploited and continues to exploit its dominant market position by imposing supracompetitive price increases on its customers.  As a former customer, Foodwit paid an over 300% price increase to ESHA.

176.    When ESHA's customers seek out alternative solutions, ESHA sets up roadblocks on their path to competitor products by delaying or denying them access to export of their own data inputs into ESHA's product.

177.    When emerging competitors like Foodwit seek to enter the SaaS-based applications for food-labeling compliance market, ESHA threatens and ultimately institutes pretextual litigation to stifle competition.

178.    Rather than competing on the merits of its product or pricing, ESHA seeks to foreclose competition through exclusionary tactics and sham litigation, which harm competition in the market for SaaS-based application for food-labeling compliance.

### COUNT I

*Violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2*

179.    Foodwit restates and incorporates by reference the allegations in paragraph 1

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

through 178 of this Complaint as if fully set forth herein.

180.    As set forth above, ESHA has monopoly power in the U.S. market for SaaS-based applications for packaged food-labeling compliance.

181.    As set forth above, ESHA acknowledges its own monopoly power in its marketing materials, repeatedly confirming its dominant share of the relevant market.  ESHA's monopoly power has been further confirmed by its ability to increase prices by 5-10 times, understanding, as its customers expressed, that "there is no viable alternative."

182.    The U.S. market for SaaS-based applications for packaged food-labeling compliance is highly concentrated, and there are significant barriers to entry.  Foodwit is aware of only a small number of players in the relevant market, with ESHA as the significantly dominant player.

183.    ESHA has engaged and continues to engage in anticompetitive conduct including the conduct described above in an attempt to maintain its monopoly position in the U.S. market for SaaS-based applications for packaged food-labeling compliance.

184.    ESHA's anticompetitive conduct, viewed independently and when taken together, has harmed, continues to harm, and threatens to further harm to the U.S. market for SaaS-based applications for packaged food-labeling compliance by the prevention or exclusion of potential competitors for the unlawful purpose of charging customers supracompetitive prices.

185.    ESHA's aggressive intimidation campaign has further had the effect of chilling competition to reduce the selection of SaaS-based applications for packaged food-labeling compliance.  Based on the market conditions, including both legitimate barriers to entry and ESHA's anticompetitive conduct, ESHA has a dangerous probability of success in maintaining its monopoly power.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

186.    ESHA's exclusionary conduct lacks a procompetitive justification that offsets the harm it caused and continues to cause.

187.    By its acts, practices, and conduct, ESHA has engaged in a course of conduct that amounts to unlawful exercise and maintenance or attempted maintenance of monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT II

*Violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2*

188.    Foodwit restates and incorporates by reference the allegations in paragraph 1 through 178 of this Complaint as if fully set forth herein.

189.    As set forth above, ESHA has monopoly power in the U.S. market for SaaS-based applications for packaged food-labeling compliance.

190.    As set forth above, ESHA's lawsuit against Foodwit is objectively and subjectively baseless:  no reasonable litigant would conclude that ESHA's substantive allegations in support of its claims, or its venue and jurisdiction allegations, are reasonably likely to result in a favorable outcome.  For example, ESHA appears to allege that its "Trade Secrets" include its Genesis database, which it refers to as its "crown jewels," and further appears to allege trade secret protection over functional and visible features of the Genesis database including "[b]uild and scale recipes from ingredients," "[l]ook and feel of the user interface," "SaaS-based application" or "Reporting and downloadable print production assets (labels)."  No reasonable person could conclude that these products or features are protectable as trade secrets.

191.    ESHA's Genesis database is a cloud-based product.  ESHA accordingly has access to substantial information regarding the manner and scope of any user's access in the form of software logs.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

192.    On information and belief, ESHA investigated its software logs and determined its allegations of "theft" wholly lack merit, but it filed suit anyway.

193.    On information and belief, ESHA investigated its work-in-progress February 2024 document and determined it was not an executed agreement, such that its venue and jurisdiction allegations wholly lack merit, but it filed suit anyway.

194.    ESHA filed its Delaware action with knowledge that its claims were and are baseless for the improper purpose of eliminating Foodwit as a competitor in the relevant market.

195.    ESHA's conduct has harmed, continues to harm, and threaten to harm competition in the U.S. market for SaaS-based applications for packaged food-labeling compliance by the prevention or exclusion of potential competitors for the unlawful purpose of charging customers supracompetitive prices.

196.    By its acts, practices, and conduct, ESHA has engaged in a course of conduct that amounts to unlawful exercise and maintenance or attempted maintenance of monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## COUNT III

*Declaration of No Misappropriation of Trade Secrets,*

*Defend Trade Secrets Act, 18 U.S.C. §§ 1831-39*

197.    Foodwit restates and incorporates by reference the allegations in paragraph 1 through 178 of this Complaint as if fully set forth herein.

198.    ESHA alleges it owns "Trade Secrets" and that "Foodwit falsely and deceptively marketed, and continues to falsely and deceptively market, Trustwell's crown-jewel Trade Secrets as Foodwit's own creation, the result of Foodwit's own honest, hard work." *ESHA Research, LLC v. RLH Assets, LLC*, No. 25-206, Docket No. 1 ¶ 28 (D. Del. Feb. 20, 2025).

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

199.    ESHA has not identified any specific "Trade Secret" in its improper Delaware complaint, its correspondence with Foodwit, or anywhere else.

200.    To the extent ESHA alleges its Genesis database is itself a "Trade Secret," such an allegation would be patently meritless for the reasons set forth above.

201.    To the extent ESHA alleges any of the features listed in paragraph 25 of its Delaware complaint—including "[b]uild and scale recipes from ingredients," "[l]ook and feel of the user interface," "SaaS-based application" or "Reporting and downloadable print production assets (labels)" are protectable as trade secrets, such an allegation would be patently meritless for the reasons set forth above.

202.    ESHA has failed to identify any trade secrets that are not the subject of public knowledge or known to anyone in the field, disclosed to others by ESHA itself, or that derive any independent economic value, actual or potential, from not being generally known or reasonably ascertainable by others in the field.

203.    Foodwit has not misappropriated any ESHA trade secrets and does not possess any ESHA trade secrets such that it could use or disclose them.

204.    An actual, substantial, immediate, and continuing controversy exists between Foodwit and ESHA regarding whether Foodwit misappropriated any trade secrets of ESHA.  A judicial declaration is necessary and appropriate to determine the parties' rights regarding these purported trade secrets.

## **COUNT IV**

### *Declaration of No Breach of Contract*

205.    Foodwit restates and incorporates by reference the allegations in paragraph 1 through 178 of this Complaint as if fully set forth herein.

Page 40 - COMPLAINT

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

206.    ESHA alleges breach of one or more License Agreements by Foodwit's "using Genesis Foods and related information" and "refusing to comply with Trustwell's demands." *ESHA Research, LLC v. RLH Assets, LLC*, No. 25-206, Docket No. 1 ¶ 28 (D. Del. Feb. 20, 2025).

207.    ESHA has not identified what aspect or aspects of "Genesis Foods and related information" Foodwit allegedly uses.

208.    ESHA has not identified which of its "demands" it alleges fall within contractual obligations.

209.    Foodwit has fully performed under and has not breached any contract with ESHA.

210.    An actual, substantial, immediate, and continuing controversy exists between Foodwit and ESHA regarding whether Foodwit breached any alleged provision of any alleged contract.  A judicial declaration is necessary and appropriate to determine the parties' rights regarding any valid agreement among the parties.

## COUNT V

*Tortious Interference with Prospective Business Relations or Economic Advantage*

211.    Foodwit restates and incorporates by reference the allegations in paragraph 1 through 178 of this Complaint as if fully set forth herein.

212.    Foodwit had and has a reasonable expectation of business relations with prospective customers who have approached Foodwit to employ its SaaS-based application for packaged food-labeling compliance.

213.    ESHA was and is aware of Foodwit's expectation of business relations and economic advantage from those relations with prospective customers, including customers seeking to escape ESHA's supracompetitive pricing.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

214.    ESHA intentionally and tortiously interfered and continues to interfere with Foodwit's prospective customers by the improper conduct described in this Complaint, causing Foodwit damage.

215.    In the absence of ESHA's interfering conduct, Foodwit would with reasonable probability have realized its expected business relations or economic advantage.

## COUNT VI

### *Breach of Contract*

216.    Foodwit restates and incorporates by reference the allegations in paragraph 1 through 178 of this Complaint as if fully set forth herein.

217.    Foodwit's agreements with ESHA include Paragraph 20, entitled "Governing Law," which states "This Agreement shall be governed by and construed in accordance with the laws of the state of Oregon without regard to, or application of, any conflict of law provisions."

218.    Foodwit's agreements with ESHA include Paragraph 21, entitled "Jurisdiction, Venue," which states "The parties agree that any suit, action or arbitration proceeding arising out of or relating to this Agreement shall be brought in Multnomah County, Oregon, and the parties expressly consent to the personal jurisdiction over them of any state or federal court in Multnomah County, Oregon."

219.    Foodwit fully performed its obligations under its agreements with ESHA.

220.    On February 20, 2025, ESHA filed an action against Foodwit in Delaware, in violation of its agreements including Paragraphs 20 and 21. *ESHA Research, LLC v. RLH Assets, LLC*, Case No. 25-206, Docket No. 1 (D. Del.).

221.    ESHA's breach of its agreements including Paragraphs 20 and 21 resulted in damage to Foodwit including costs to investigate and respond to an improperly filed lawsuit.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

## PRAYER FOR RELIEF

**WHEREFORE**, Foodwit requests relief from this Court as follows:

      A.      A declaration that Foodwit is not liable for breach of contract;

      B.      A declaration that Foodwit is not liable for violations of the Defend Trade Secrets Act, 18 U.S.C. §§ 1831-39;

      C.      Judgment that ESHA is liable for violations of the Sherman Act, 15 U.S.C. § 2;

      D.      Judgment that EHSA is liable for tortious interference with prospective business relations or economic advantage;

      E.      Judgment that EHSA is liable for breach of contract;

      F.      Preliminary and permanent injunctive relief prohibiting ESHA from further violations of the Sherman Act;

      G.      An award of all damages for ESHA's violations in an amount to be proven at trial;

      H.      An award of treble damages;

      I.      An award of attorneys' fees;

      J.      An award of costs;

      K.      An award of prejudgment interest; and

      L.      All equitable and other relief the Court finds just under the circumstances.

DWT 26757422v1 0085000-004261

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax

## JURY DEMAND

Foodwit demands a jury trial on all issues and claims so triable.

DATED this 22nd day of April, 2025.

**DAVIS WRIGHT TREMAINE** LLP


By  _s/ P. Andrew McStay, Jr._
      P. Andrew McStay, Jr., OSB 033997
      andymcstay@dwt.com
      560 SW 10th Avenue, Suite 700
      Portland, Oregon 97205
      Telephone: (503) 241-2300
      Facsimile: (503) 778-5299

      Matthew S. Warren (*pro hac vice to be filed*)
      matt@warrenkashwarren.com
      Erika H. Warren (*pro hac vice to be filed*)
      erika@warrenkashwarren.com
      Shaida Shahinfar (*pro hac vice to be filed*)
      shaida@warrenkashwarren.com
      WARREN KASH WARREN LLP
      2261 Market Street, No. 606
      San Francisco, California 94114
      Telephone: (415) 895-2940
      Facsimile: (415) 895-2964

      *Attorneys for Plaintiff RLH Assets, LLC*

DAVIS WRIGHT TREMAINE LLP
560 SW 10th Avenue, Suite 700
Portland, Oregon 97205
(503) 241-2300 main · (503) 778-5299 fax